The next case on the calendar, which is Smith v. Agdeppa. If I'm pronouncing that correctly, it's 20-56254. There should be two of you. Now I see the second. Counsel, can I just do a sound check? Can you hear us okay? Yes, Judge Kristin Edline, and I can hear you fine. Perfect. Thank you. When you're ready. Thank you very much. May it please the Court, Kevin Gilbert for Los Angeles Police Officer, Defendant, and Appellant Officer Agdeppa, we would respectfully request that two minutes be reserved for rebuttal. Go right ahead, and you may reserve the time if you could just keep an eye on the clock, please. Thank you very much. The issue presented is whether or not Officer Agdeppa was entitled to qualified immunity. It is a narrow issue, and we believe the trial court erred on at least two grounds. As the Court is aware, the issue of qualified immunity is to be defined very clearly based upon established law. In this case, the trial court committed an error which is directly addressed by the Supreme Court, actually, in defining it at a very high level. Furthermore, the trial court erred in deciding that there was a disputed issue of material fact that precluded summary judgment. Now, beginning with the first issue about the qualified immunity, as this Court is aware, the Supreme Court has recently addressed this through many published decisions. Most recently was Keesla, for example. In Keesla, the Supreme Court cautioned the Ninth Circuit in particular and trial courts to avoid defining the clearly established prong at a high level of generality. In fact, the Supreme Court specifically addressed the Diorle case, which was a 1985 case where the Ninth Circuit had addressed that it's generally principled that a person is able to be free from excessive force or lethal force if it's not otherwise appropriate. Despite the Supreme Court guidance there, and then again repeated in Sheehan, the trial court simply echoed the comments of Diorle generally prohibits the use of excessive force in situations such as this. So if we agree with you about that, then I'm interested in the more specific holding here, the sub-argument, if you will, which has to do with our case law requiring that when is justified, when an officer is justified in using deadly force, lethal force, that if practicable, he or she must first give warning. As a separate argument, a much more specific holding than the case law that you just, I think, very correctly identified. Could you speak to that, to the failure to warn? Absolutely. But the failure to warn goes to the reasonableness of the use of force, not to the qualified issue, qualified immunity prong. As the Court is aware, a failure to warn is not necessarily actionable, and that goes to the reasonableness of the use of force and whether there's a civil rights violation. I'm not sure I agree with you about either of those propositions. Well, Your Honor, the Supreme Court and the Ninth Circuit established precedent has confirmed that a warning is required where feasible. I just said that, counsel. I understand that. So that's what I'm asking you to focus upon, and the word we used was practicable. I don't think it's different than feasible. So in this case, it's an unusual case. My hypothetical asks you to assume, I think you're correct for purposes of my hypothetical, that part of the analysis here in the trial court defined the use of force part of the discussion at too high a level of generality. But if we could focus on the more specific requirement in our case law, that where the circumstances justify the use of lethal force, that a warning must be given where practicable. Why isn't that a problem in this case? Because in this case, the question is qualified immunity addresses whether or not every reasonable officer would have understood that in that instance, that his actions were wrongful. I know that, counsel. So why isn't that a problem here? Since we'd said it in several cases, we'd several times said prior to the use of lethal force, if practicable, and it's not always practicable, if practicable, the warning has to be given. And so really, if I could focus you on that, I'm struggling with this because a warning was given, and the declaration of your client is very unique on that point. I said words to the effect of stop, and we've scoured this record, and there's an audio recording, although at this point not a video recording, right? And the audio, we can hear somebody say, sounds like stop. So what about this very specific point? There is evidence in the record that Officer Agdefi yelled something. He does not recall specifically what he yelled. I know that. At that moment, it's immediately after he's been struck in the face and disoriented. At that point, Officer Rodriguez is laying on the floor with the assailant who's over 6 feet tall, over 300 pounds, straddling her, beating her, holding her taser against her face. All of that we know. And at that point, Officer Agdefi yells something. He believed he gave a verbal warning. The case law does not necessarily require a verbal warning every time. He gave as much warning as he could when he regained his wits, and he sees what's going on in front of him. He sees the assailant over her, pummeling her, trying to kill her. I'm not trying to be difficult, Counsel, but you're telling us the facts that we know, and I think they're well stated, they're really well articulated in the record. So I understand that. I'm sorry, then I don't understand your question. That's okay. It's just that I'm not trying to make it difficult, but it is a really sliver of a question. The district court found that a jury could decide, right, that there's a question of fact about whether the required warning was given here, and maybe the jury could decide that there's a question of fact about whether it was really possible to give the warning. That's what I'm trying to focus on. Is that wrong? I believe it is. I don't believe that established precedent specifically requires a warning. It's when practical as the court addressed. So is your position, again, to be specific, is your position that a reasonable jury could only find that it was not possible to give a warning? Is that your position? I believe that it goes to the issue of qualified immunity, Your Honor. I believe a jury could not find that it was unreasonable to not give a warning if one was not given. I believe the factual record is that one was given. I believe the jury could not find to the contrary based on the facts that are undisputed, as well as on the case law. And then to go to the third component, I believe that under qualified immunity, it has to be undisputed that the officer believed his actions were wrongful, and this was addressed in ISAVEA. ISAVEA had almost identical facts. The officer was on the bed, had been knocked on the verge of being unconscious. It goes back to the undisputed part of the discussion today. That's not a failure to warrant case. Right. So just if I can, and then I'm going to get out of your way. But it sounds like you think that the district court was incorrect when she decided that a jury could decide that there's a dispute about whether a warning was given. Is that right? Yes. And you think there's a dispute of fact about whether a warning was required to be given? I think that's a dispute of law, not fact. But I agree with that, yes. And you think that a reasonable officer wouldn't have known, is that right, that a warning is required if it's practicable? In this situation. Okay. Help me out with that one. When you say in this situation, I was just reciting or trying to recite a legal principle, and now you're telling me in this situation, which strikes me as a position that you think that the, you know, factually that the warning was not required, and I'm asking a different question. That's why we're missing, I think. Okay. So, I'm sorry. Tell me again the question you're asking. Is it your position that a reasonable officer would not have known that if practicable, he needed to give a warning that he was going to use lethal force? Yes. Why? Because in this situation, you've got the rapidly evolving situation. But that's a factual argument. I'm asking, do you think that the, which I appreciate, and you've articulated very well in your briefing and here today. Is it your position that a reasonable officer would not have understood this legal ruling? That if possible, he's got to give a warning? And where I'm struggling, Your Honor, is I don't know that I necessarily have the same understanding of the law as you do. And so, forgive me. My understanding of the law is that it's we're practical. And so, that comes down to a factual question of is it practical, and it doesn't need to be given in every situation. And that based on the factual record here, you have warnings of we're going to tase you with any use of force. You've answered my question. Thank you. Is your argument that the holding that you've been discussing, which is a warning must be given before deadly force is employed whenever practicable, is at too high a level of generality and that the case law doesn't develop when it is and when it is not practicable? Absolutely, Your Honor. And that's the un-clarity in the case law that you're pointing to in order to get qualified immunity on this lethal force warning issue? Absolutely. How could it be more specific than us saying before you resort to lethal force, you have to give a warning that you're going to do that if the circumstances allow? Your Honor, as the Supreme Court has stated multiple times, under qualified immunity, it must be clear to every reasonable officer, not any reasonable officer. How would a reasonable officer not? What's vague about that ruling, about that rule of law? What happens if somebody pulls a gun instantly? That's the factual point, and I'm absolutely in agreement with you on that point, and there's going to be a million shades of gray in there about whether it was practical or not, but we're just not finders of fact. My question was, and maybe you've answered it. Well, the question, Your Honor, for me is where are the shades of gray? Where do you draw the line? At what point do you say to the officer, you can act immediately to save your life? At what point do you say this is where it's clear? Absolutely. Those are all factual distinctions. I'm asking you about whether officers would understand the legal ruling, that if I can give a warning before using lethal force, I'm required to do so. I believe that every officer would understand generally that where practical, where feasible, a warning can and should be given and must be given. So your argument is inherently on the factual side? My argument is under the law. It's not clear where practical comes into play. Okay. So where do you draw that line? Is it if I come up behind an officer with a weapon, do they have to step aside and say, hey, time out, I'm going to use force if you don't set that down, or can they defend themselves immediately? The law under the use of lethal force is if there is an eminent threat, the officer can defend themselves for the life of 100 years. I know that. We know that, and I appreciate that. I really do. I don't want to take up more of your time on this because I'm not sure you can answer my question any more definitively than you already have, and I appreciate it. And I appreciate it. The problem is these laws do not, they're not clearly defined. You have the clearly defined under the eminent use of force, and it's been addressed in detail, the where feasible aspect or where practical has not been. So in this case, you have the court denying it at a high level of generality, but you also have it relying on inadmissible facts. And, in fact, if you look at the answers to the record. Inadmissible facts? Unsubmitted and inadmissible factual record. The court found that there was a factual dispute and looked, for example, at anonymous witness, and I believe it's at page ER 18 where the court cites to the anonymous witness that no party submitted a declaration, there was not a deposition, but the court found that those statements, which were unsworn hearsay, as well as the Board of Police Commissioners' report, which was based upon a different legal issue, namely whether there was a policy violation, created discredited facts. And then just yes or no? I'm going to say yes, and I think you briefed that very well, those evidentiary issues. But let me just check to see if my colleagues have questions about the evidentiary issues before we take a bunch of your time on that. How much time did you say you wanted to reserve? I was going to hold two minutes. Oh, go right ahead. You've got three. Go right ahead. So I think we're, unless you have questions, I'll submit. I think the issue that we've addressed in very detail is whether it's clearly established, and I believe we're in agreement as far as the legal issue and the fact that the question becomes one of did the court err and define it too high of a level. ISAVEA is the leading authority on this. It was decided roughly a year before this case. Every reasonable officer would have relied on that, which if you take the ISAVEA case and you literally do a name change of the briefing and the court of appeal opinion, it is the same legal issue. The trial court denied summary judgment. Two officers losing in hand-to-hand combat. One of the officers begins to lose consciousness. At that point, yells, shoot him. No further warnings, no further announcement that there's going to be a lethal force utilized. And at that point, the suspect was shot. It was an announcement, shoot him.  And there was a similar announcement from Agdepa where you can hear something on the audio that confirms that something is said. Does he anywhere in the record indicate that he didn't see it? And this is truly a question. I didn't see anywhere where, Mr. Officer, Agdepa says that he gave warning that he was going to use lethal force. Where's the effect of stop? Yes. He said he yelled something, but he doesn't recall specifically. He was still somewhat dazed. Right. Thank you. When you come back, we'll put two minutes on the clock. Thank you. Thank you for your patience with the questioning. I can't see opposing counsel. There he is. Okay. Go right ahead. Good morning. May it please the court. I'm Ed Lyman on behalf of the decedent's mother, Paulette Smith. And just touching on that point about Isobea, it's clearly a distinguishable case and facts in the sense that here there weren't any warnings given. So using that as a comparison. Go right ahead. The comparison to Isobea is sort of beside the point for me because it seems there the, Mr. Agdepa is sort of trying to say not only was the law not clearly established, but that it was clearly established in his favor. I don't think he needs that. So I guess the question for you is what is the clearly established law showing that this was a constitutional violation, recognizing what the Supreme Court has said about the level of specificity we need to employ when doing this analysis? Well, if we look at the case of Tennessee versus Garner, for example, there's genuine disputes of facts concerning whether there was any kind of imminent threat posed to Officer Agdepa, Officer Rodriguez, or anybody else for that matter in this enclosed environment. And the district court found genuine disputes of facts. I disagree with you about that, counsel. If we disagree with you about that, we've got the audio and the video. And if we disagree with you on that point about whether there's a dispute of fact about whether he represented an imminent threat, then what happens? If you disagree with me about that, if there's an imminent threat, well, we're still looking at the use of lethal force, and there's five shots that occur. And we see in Officer Agdepa's statements and testimony that he had five opportunities here and deployed five rounds of lethal force of a nine-millimeter shell. And it's disputed there in terms of what Mr. Dorsey's body position was in, for example, and the angle and the trajectory of these bullets. And then we see Officer Agdepa saying that he had time to stop and reassess the situation between each round that he got fired. So each opportunity was another one to reassess and give another warning. You said he had an opportunity to reassess between the rounds? Yes. To my ear, the rounds sound like they're really rapid in succession. And I think that's definitely what's confusing in terms of Officer Agdepa's credibility, and that's what we see in the district court's findings there and why there is a dispute of genuine issues there. And the dispute is that there was testimony that he had opportunity to reflect between the shots. Is that your position? That's not necessarily the only dispute, but it speaks to the broader point of the district court's findings that there's credibility issues there. There's different versions of events. There's different witnesses saying different things. That's pretty common that we have, especially after a very traumatic event, that the witnesses are going to recall that differently. District courts see that all the time. And even on appeal we see that all the time. So that can't be the answer, at least on my scorecard. I think there's a very well-articulated argument, and an opposing counsel has just made it here again today repeatedly, as he very patiently entertained these questions, that there's a tendency to define the law at too high a level of generality, which is why I've asked him, and now I'll ask you to focus on the more specific case law requiring warning prior. You've gone away. Are you there? I'm here. Disappeared. All right. So my question is, could you speak to that? He's making the argument that there's, even though we've got case law talking about or requiring the use of warning prior to resorting to the use of lethal force, if practicable, and he's relying on the if practicable part of that holding. Could you speak to that? Is that still too sufficiently specific or too general? What is it? Sure. In terms of it's in our brief, we have D'Orly, for example, we showed and distinguished that. Then Rose v. City of Sacramento, we have very similar facts there in that case in the use of deadly force. To be clear, my question is, would any officer know that before using lethal force, he or she is required to give a warning that lethal force was going to be used if practicable. Would any reasonable officer know that? Yes. Judge Kristen, that's an excellent question. It's in the Coast Training Manual for the LAPD. It's part of the manual, and I believe that's in the record as well. I think it is, too. So here's the problem with this case, and I keep trying to get people to focus on this. Very sliver of an issue. It is in the record. But it still begs the question because in this case, it's very unusual. Officer Agdepa's declaration indicates that he did give warning, and then we can hear on the audio, it sounds like someone says stop. That may be a different word that's given. But what if we were to decide that he did give warning. There's nothing in the record where he claims that he gave warning that he was going to use lethal force. What do we do with that? Well, I mean, obviously on the interlocutory appeal of the issue of qualified immunity, we're confined to all the findings in favor of the plaintiff in terms of factual determinations made below. So we're confined to that, and that would have to be in my client's favor in terms of any kind of discussion. Okay, so let's look at it in your client's favor. In your client's favor, the undisputed facts would be that, for my hypothetical, if we decide that the circumstances allowed the use of deadly force because they did, then in this circumstance, the undisputed evidence, I think, shows that a warning was given, and we can't tell what it was. Is that right? I'm not sure I understand. The hypothetical is assuming that a warning was given. Did he have to do that? Well, I mean, he would have to in this specific situation because there was an element of time and separation. I mean, this occurred over about 14 minutes when we see the beginning of the body-worn camera and all the footage. So if we look at the California Supreme Court in Yount and its progeny, you start to see this development of separating time and giving repeated warnings over time and different opportunities to de-escalate or use different tactics. Officers here used a lot of different tactics. Non-lethal force, as you said, for about 13 minutes, I think, were tasing all kinds of—and that wasn't working. And so when we get right down to it, one officer was down. She was being pummeled. I think that's undisputed. And so—and Officer Agdepa's testimony is that he thought the next blow could take her life. And so if my hypothetical is that he was justified in using lethal force, I'm trying to get at what warning was required to be given there. What is your answer to that? What's your position on that? I mean, he would have to give the warning that he's about to fire and use lethal force. I'm about to shoot. And then the question is, was that law clearly established? That's the question. So Gonzales says, the En Bonne Court says, a warning must be given before deadly force is employed whenever practicable. Is that—so you have—in order for you to win on that theory, which is a lethal force warning should have been given before the shots were fired, you have to establish that that law, that legal principle, clearly establishes in this context, in this factual context, that the warning should have been given. Sure. I mean, not only that, but, I mean, he had the time. But, again, we go back to the argument of facts about whether she was being pummeled or whether there was any— I'm kind of focusing on the law and not the facts. Please. So where's the clearly established law? So is—the principle of law I just stated, and I'll just state it again so we're clear, a warning must be given before deadly force is employed whenever practicable. Is that at too high a level of generality in order to qualify as clearly established law under the Supreme Court's and this Court's qualified immunity precedents? No, it's not, Your Honor. No, Your Honor, whenever practical, if we apply that standard to the facts and we see that Officer Adepa says she's being pummeled for 30 to 40 seconds and taking all these blows to the head, which aren't evidenced in her photos or anything like that, any type of injury such as that, so there's that credibility issue, there's all this time passing by that we're seeing about 30 to 40 seconds, I believe, that Adepa testifies to in his depo of watching this pummeling. What case would you point to that would have put the officer on the greatest notice that in this type of situation we have a violent struggle and taser that was attempted that a further warning of lethal force was constitutionally required? Well, again, we can go back to the notices provided in Officer Adepa's training manual. And in terms of case law, we can look at Mendoza and Gonzalez and Isobea. We can look that it's not even necessary sometimes in these situations that there's a bright line or a clear precedent in a situation as grave as this, which takes us into a different kind of level of balancing ultimately. Do we have other case law where we've looked to a training manual to establish what the reasonable officer would have known? I think of that off the top of my head, I apologize there. But that would establish the reasonableness there, clearly, that's part of your training. If that's your manual, and that's the policy of the state of California, for example, in our post-training manuals, that these warnings must be given. And it comports also, again, with Gonzalez when we go back there. They're never practicable. And with the passage of time here, we see that there was plenty of time for such a warning to be given, assuming that the facts aren't in dispute, which they are. Counsel, let me ask you a completely different question. I'm going to ask both lawyers, as we often do. Have you tried to mediate this case? Yeah, we were subject to mandatory mediation by the district court. I'm uncertain in the record if we had already done that. I think we did that before the motion for summary judgment was filed. Right, and so at this point, given that you're now on appeal and you've got a summary judgment ruling, has there been any—that's my question. Have you been in contact with the Ninth Circuit mediators? No, I haven't. Okay, thank you. I don't have any further questions, but I don't know if you do. Sure. Did the plaintiff argue below or even in this court that Gonzalez sets forth clearly established law that would have put any reasonable officer on notice that a lethal force warning was required before shots were fired? Let me see. Yeah, on page 34 of our brief, we kind of lay that out. Or 24, I apologize. Yeah, I think that's the Qualified Immunity Part 1, the Saucere Part 1 part of your brief and not the Saucere Part 2 part of your brief. I know Saucere's been overruled, but— I have to be able to check the record on that. Might be page 8586. Oh, sorry, ER. That's my ER site. I didn't mean to imply that you had an 85-page— I'm sorry, which ER what? I think it might be ER 8586. Right, and that would be in the district court. Right. Okay. I thought that was the question. Forgive me. Your question was about the district court? The question was both, both the district court and the court of appeals. Where did the plaintiff argue that the law was clearly established that officers in this situation would have given a lethal force warning before firing the shots? I think it's around ER 55, somewhere in that transcript. I'm just trying to find that in terms of the warnings. That's been raised in the district court during the summary judgment adjudication. I think it's a site to Harris, which was what Gonzales relied on whenever practical warning must be given before deadly force is employed. But it's a Harris site, which is what Gonzales relied on. I have that at ER 2526. Is that the correct site? 62526? I'm sorry. I'm sorry, again, are you asking on appeal or district court? I'd be happy with either. Okay. I mean, if I could submit it after... And just to be candid, I don't think it's in either. But I could be missing something, which is why I'm asking you. I thought I found it in both places. So one of us, maybe we should go to mediation. Is there anything further, Counselor Judge Brass, anything further? No, nothing. Okay, thank you so much for your argument today. Thank you. Thanks. Counsel, you have some time left on the clock. We'll put two minutes on, please. Thank you. And it continues on, and actually citing that, or excuse me, it references Glenn versus Washington County, which states other relevant factors include the availability of less intrusive alternatives to use force employed, whether proper warnings were given, and whether it should have been apparent to officers what the person they used force against was emotionally disturbed. Obviously, that's a different case involving emotional disturbance, but it includes the reference to whether warnings were given was a factor. In the George versus Morris case, it's 736F3829. The court confirmed that the most important factor is whether the suspect posed an immediate threat to the safety of the officers or others. The other question that's undefined is, what is a specific warning that must be given? Does it have to be words of, I'm going to shoot, stop, I'm the police, or something else? It seems to me even that might be context-specific because there are some circumstances where we could see, and here we can't, we don't have a visual. But there might be other circumstances where a suspect can see the officer has drawn a gun, right? And we don't know that here about just how they were positioned, whether that would have been visually apparent. Thank you. What we do know is that the suspect understood there's two uniformed officers who were trying to detain him. We see that on the video. We see and hear the attempted taser, uses of taser. I believe there's six or seven total tasers. Did they both use a taser? Yes, Your Honor, they did. And they both lost their tasers in the struggle too, which strikes me as significant. Yes, they did. The suspect takes Officer Rodriguez's taser. Officer Agdepa drops his when he's dazed and punched in the face. So at that point, you have a situation where the suspect knows they're uniformed officers, knows they're trying to take him into custody. You've had a prolonged struggle. He knows that they have weapons out. They already have their less lethal weapons out. Any reasonable officer, the question is, what specific words need to be said and at what duration? And in the timing of the rapidly evolving situation, there is no clearly defined law that says, at this point, you must say these words. At this point, you can simply act in self-defense. It's all about what is practicable. Let me ask you the same question, whether you have been in contact to consider mediation in this case. We have discussed it with the Court of Appeals mediation panel. We've been willing to sit down and talk with them. We also did mediate the case before coming to the Ninth Circuit. We're happy to sit down again. Before the summary judgment ruling? Before the summary judgment ruling and after the summary judgment ruling as well. Okay. Great. Anything further? No. Thank you so much for your arguments. Thank you both. Thank you.
judges: CHRISTEN, BRESS, Feinerman